Index No. <u>1:20-cv-04008-MKV</u>

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
    In Re: AN FRIEDA DIAMONDS, INC.,


    RONI RUBINOV and NEW LIBERTY
          PAWN SHOP, INC.,

                        Appellants.
-----------------------------------------------------------------x


**APPEAL FROM ADVERSARY PROCEEDING DECSION RENDERED IN**
**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**


**APPELLANTS' BRIEF IN SUPPORT OF**
**RONI RUBINOV and NEW LIBERTY PAWN SHOP, INC.'S**
**APPEAL OF ADVERSE DECISION**

Akiva Shapiro Law, PLLC
Akiva Shapiro, Esq.
Attorney for Appellants
1 West Park Drive
Old Bethpage, NY 11804
Mailing Address:
696 Old Bethpage Rd #540
Old Bethpage, NY 11804
Phone: (347) 435-6529
Fax: (347) 710-2543
Akiva@AkivaShapiroLawPLLC.com

September 13, 2020

# TABLE OF CONTENTS

I. JURISDICTIONAL STATEMENT .................................................1

II. STATEMENT OF ISSUES PRESENTED....................................1

III.STATEMENT OF THE CASE .................................................2

IV. SUMMARY OF THE ARGUMENT ........................................7

V. ARGUMENT ..........................................................................9

   A.    There is no basis for personal liability against Roni Rubinov. ...............9

   B.    Section 541(b)(8) of the Bankruptcy Code Protects NEW LIBERTY's secured interest in the pawned diamonds. .........................................17

   C.    VNB's UCC filing did not establish a priority claim over specific diamonds pawned to NEW LIBERTY in any case. ..........................21

   D.    The evidence did not establish that AN FRIEDA was the rightful owner of the diamonds. Rather the evidence either was inconclusive or tended to demonstrate that the diamonds were owned by the debtor's principal, Ronen Konfino or his wife, personally, or were on "Memorandum" owned by third party consignors, and not subject to VNB's security interest.................................22

      1.    Non-Memorandum Diamonds .........................................23

      2.    Memorandum Diamonds................................................30

VI. CONCLUSION....................................................................34

VII.CERTIFICATE OF COMPLIANCE...........................**Error! Bookmark not defined.**

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*In re Allou Distributors, Inc.,*
  379 BR 5, 30 [Bankr EDNY 2007] ..................................................... 26, 29

*Anderson v. City of Bessemer*,
  470 U.S. 564, 574 (1985) ..................................................................... 2

Cortlandt St. Recovery Corp. v Bonderman,
  31 NY3d 30, 47-48 [2018] ........................................................ 7, 10, 13, 15

In re: Gen. Motors LLC Ignition Switch Litig.,
  RICO Bus Disp Guide 12747 [SDNY July 15, 2016] ................................. 15

*Mayfield v Asta Funding, Inc.*,
  95 F. Supp 3d 685, 701 (S.D.N.Y. 2015) ............................................. 13, 14

*In re Moore,*
  448 BR 93, 101 [Bankr ND Ga 2011] ................................................. 19, 20

Nat'l Survival Game, Inc. v. Skirmish, U.S.A., Inc.,
  603 F. Supp. 339, 341 (S.D.N.Y. 1985) ............................................... 13, 15

*Key Bank of New York v. Grossi*,
  227 A.D.2d 841, 843, 642 N.Y.S.2d 403, 404 (3d Dept. 1996) ....................... 13, 15

Overbaugh v. Household Bank N.A. (In re Overbaugh),
  559 F.3d 125, 129 (2d Cir.2009) ........................................................... 2

*Smith v Mixon,*
  788 F2d 229, 232 [4th Cir 1986] ........................................................ 32

*United States v Lax,*
  414 F Supp 3d 359, 368 [EDNY 2019] ................................................. 16

## Statutes

11 U.S.C. § 541(b)(8) ..................................................... 5, 7, 9, 17, 18, 19, 20, 21, 22

11 U.S.C. § 549 .......................................................................................... 5, 12

28 U.S.C. § 158(a) ......................................................................................... 1, 2

Fed. R. Bankr. P. 8003 ....................................................................................... 1

Fed. R. Bankr. P. 8009 ....................................................................................... 1

Fed. R. Bankr. P. 8013 ....................................................................................... 2

New York General Business Law § 44(3) ................................. 5, 30, 31, 32, 33

NY UCC § 9-102(a)(20) ................................................................................... 30

New York UCC Article 9, Part 6 ................................................................ 32, 33

## Other Authorities

Collier on Bankruptcy ¶ 541.24 ..................................................................... 18

## I. JURISDICTIONAL STATEMENT

The District Court has jurisdiction over this appeal pursuant to Fed. R. Bankr. P. 8003 and Fed. R. Bankr. P. 8009. This is an appeal from a final Judgment and Decision After Trial rendered in the United States Bankruptcy Court, Southern District of New York, Index No.: 15-11862 (MEW), on April 29, 2020. Appellants filed their timely Notice of Appeal on May 22, 2020.

## II. STATEMENT OF ISSUES PRESENTED

**A. Whether there is any basis for piercing the corporate veil and holding Roni Rubinov personally liable.**

*The answer respectfully submitted is: No.*

**B. Whether Section 541(b)(8) of the Bankruptcy Code Protects NEW LIBERTY's secured interest in the pawned diamonds.**

*The answer respectfully submitted is: Yes.*

**C. Whether VNB's UCC filing established a priority claim over specific diamonds pawned to NEW LIBERTY.**

*The answer respectfully submitted is: No.*

**D. Whether the evidence established that AN FRIEDA was the rightful owner of the diamonds.**

*The answer respectfully submitted is: No.*

For all issues presented, this Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in

pertinent part that "[t]he district courts of the United States shall have jurisdiction to hear appeals ... from final judgments, orders, and decrees; ... [and,] with leave of the court, from other interlocutory orders and decrees ... of bankruptcy judges." 28 U.S.C. § 158(a). A District Court reviews a bankruptcy court's findings of fact for clear error and reviews its legal conclusions de novo. *Overbaugh v. Household Bank N.A.* (*In re Overbaugh*), 559 F.3d 125, 129 (2d Cir.2009); see Fed. R. Bankr.P. 8013. A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364 (1948)).

### III.   STATEMENT OF THE CASE

An involuntary bankruptcy petition was filed on July 16, 2015 under Chapter 7, Title 11 of the United States Code (the "Bankruptcy Code") against AN FRIEDA DIAMONDS, INC. (the "Debtor,"   "AN FRIEDA," or "ANF"). RONEN KONFINO ("Konfio") and his wife, FRIEDA KONFINO ("FK"), are the principals of the Debtor.

Petitioner NEW LIBERTY PAWN SHOP, INC. ("NEW LIBERTY") is a collateral loan broker operating in New York City and has been licensed since 2008 by N.Y.C. Department Consumer Affairs and operates primarily with diamond and retail jewelry businesses in the New York City diamond district. Petitioner RONI RUBINOV ("RR") is the sole principal of NEW LIBERTY.

During the time period beginning December 2013 and progressing through March 2015, NEW LIBERTY issued 135 separate loan transactions with Konfino and FK. Over this time, NEW LIBERTY loaned the total sum of $3,461,000.00, issuing these funds to Konfino primarily in cash transfers. The majority of the underlying loans were redeemed between January 2014 and April 2015 (a total of 91). Many of the pledged items were specifically claimed by Konfino as being his and his wife's personally.

In May 2015, there remained 44 pawn loans which had either already fallen into default status or over the next two months - subsequently became defaults. Many of these loans were in a default status going back to the Fall of 2014 - but NEW LIBERTY acted with forbearance and did not initiate the foreclosure process until July 9-10, 2015. At that time, the bankruptcy petition had not yet been filed.

After the 30-day period passed (i.e. 8/8/2015 - 8/9/2015), the statutory redemption period closed. After the close of the redemption period, NEW LIBERTY sold the underlying collateral in five separate transactions beginning on August 10, 2015. Neither AN FRIEDA, the Trustee, nor any representative thereof, made any attempt to redeem the specific diamond inventory which purportedly belonged to the Debtor. No such claim is made within the Adversarial Complaint.

On September 9, 2015, the Court issued an *Order for Relief* relative to the underlying Chapter 7 Involuntary Proceeding. It is alleged that VNB NEW YORK, LLC ("VNB") was a secured creditor of AN FRIEDA with a perfected first priority security interest in AN FRIEDA's diamond inventory; this arose out of $1,500,000.00

credit facility issued in 2006. VNB raised the loan to $2,300,000.00 and then reduced the credit pursuant to a modification agreement (to $2,100,000.00) in May 2010.

VNB conceded that they never inspected the AN FRIEDA diamond inventory themselves - for at least four years leading up to the bankruptcy filing and never hired any outside agency to perform any "field exam(s)". VNB could not be certain where AN FRIEDA kept all its diamond inventory and what diamonds actually belonged to AN FRIEDA. VNB believed much of the inventory was with two companies entitled David Alexander and Friend & Company. During the loan period of 2013 through 2015, Konfino was routinely pawning diamonds and other items with NEW LIBERTY. VNB never objected nor undertook any action to prevent continued transfers. To account for the diamond inventory, VNB only relied upon written statements by Konfino and FK and took no steps at authenticating their representations.

After the involuntary petition was filed, on or about August 14, 2015, the Court entered an Order providing that the Debtor submit a list of assets held by others and directed that all such persons turn over such property. (BK Docket # 24). The Court entered an order for relief by granting the involuntary petition on September 9, 2015 (BK Docket # 41). On or about September 16, 2015, the Court entered an Order that RR and NEW LIBERTY were to turn over any property of the Debtor in their possession and provide an accounting to the Interim Trustee. The Trustee interposed claims against NEW LIBERTY and RR pursuant to Bankruptcy Code §549(b) (1st Cause of Action), conversion (3rd Cause of Action) and "preference recovery" (7th Cause of Action).

VNB's Answer with Counterclaims and Cross-claims (filed on October 9, 2017 as an Intervenor) alleged a cause of action for conversion against NEW LIBERTY (1st Cross Claim); a cause of action for conversion against RR (2nd Cross Claim); and a cause of action negligence against both NEW LIBERTY and RR (3rd Cross Claims). VNB has also asserted crossclaims against Defendants - Konfino and FK. Konfino and FK defaulted in this action.

NEW LIBERTY alleged they had no claim against the bankruptcy estate and claimed they acted legally under New York State law as a collateral loan broker,  having undertaken prepetition transactions with Konfino and in turn issuing monetary loans in accordance with N.Y.S. Gen. Business Law, Article 5 et seq. As such, they were negotiated freely and in the ordinary course of business. In addition, it is alleged that RR acted with full authority on behalf of the corporation NEW LIBERTY. It is further alleged that the Trustee lacks standing to assert claims against NEW LIBERTY as the subject collateral claimed to belong to the Debtor - cannot be deemed property of the estate. It is accordingly argued that the subject transfers are not avoidable per Bankruptcy Code §549, and are in fact protected under 541(b)(8) as well as NY General Business Law § 44(3).

Trial was held in the matter and concluded on October 30, 2019. On April 24, 2020, the Bankruptcy Court So Ordered a Stipulation between the Trustee and VNB wherein, *inter alia*, VNB assigned its interest against RR and NEW LIBERTY to the Trustee.

On April 29, 2020, the Bankruptcy Court issued its Decision after Trial and Judgment, awarding, *inter alia*, judgment against NEW LIBERTY and RR in favor of the Trustee in the amount of $1,242,722.07. The ruling presented for review are:

> VNB has also claimed that Roni Rubinov should be liable for conversion or for aiding and abetting a conversion of property. The evidence at trial showed that Roni Rubinov controlled the collateral and actively misrepresented what happened to it. Whether he did so to benefit himself directly, or whether he did so to benefit himself indirectly as the owner of New Liberty, does not matter. Roni Rubinov was the individual who committed the tortious acts and it is appropriate to hold him liable as a result. (Docket #160, p. 38).

> New Liberty wrongly diverted property that was subject to the prior perfected secured claim of VNB. New Liberty's failure to check the UCC filings, and its disposition of the collateral in deliberate disregard of VNB's perfected rights, constituted a conversion of property under New York law. (Docket #160, p. 46).

> VNB's security interests extended to all property obtained by AN Frieda "on memorandum," and the Trustee has the same rights to recover such property as he has to recover other property of AN Frieda. (Docket #160, p. 23).

> Given the admitted nature of AN Frieda's business, the nature of the collateral, and the inclusion of AN Frieda's names on the pawn tickets, the weight of the evidence shows that the items pawned in 41 of the 44 defaulted pawn transactions belonged to AN Frieda. (Docket #160, p. 20).

## IV.    SUMMARY OF THE ARGUMENT

RR and NEW LIBERTY argue that the lower court's decision for conversion against NEW LIBERTY and personal liability against RR individualy must be overturned. As an initial matter, even if NEW LIBERTY converted the collateral, which it did not, there is no basis for personal liability against Roni Rubinov. The lower court, relying on several outdated cases based on old lower NY court cases, and distinguishable on the facts, held that Roni Rubinov should be personally liable because "[t]he evidence at trial showed that Roni Rubinov controlled the collateral and actively misrepresented what happened to it."

Under relevant, recently articulated New York common law from New York's highest court, *Cortlandt St. Recovery Corp. v Bonderman*, 31 NY3d 30, 47-48 [2018], the standard for piercing the corporate veil to hold a corporate officer liable for acts of the corporation must be more than engaging in improper or bad faith acts. Plaintiff must demonstrate the existence of a corporate obligation and that defendant exercised complete domination and control over the corporation and abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice. Even if RR controlled the collateral and actively misrepresented what happened to it, without more, it does not remotely raise to *Cortland* standard.

With respect to conversion by NEW LIBERTY, the lower court's analysis shows a clear misapplication of the law. The lower court noted that analysis under section 541(b)(8) of the Bankruptcy Code applied. Section 541(b)(8) excludes from the bankruptcy estate property pawned by the debtor, where it is in possession of the

pawnbroker and there is no obligation to repay the loan or redeem (both of which is the case here) and where the time for redemption had expired unexercised. This last prong is where the lower court went wrong. It reasoned, in sum and substance, that since the conversion took place before the expiration of the redemption period, the property belonged to estate. This interpretation flies directly in the face of the plain meaning of the statute, which the lower court recognized was enacted with pawn brokers in mind.

Moreover, even if the pawned items were property of the estate, they were transferred from the debtor to NEW LIBERTY in the ordinary course of business. The parties' pre-trial stipulation included the stipulation that transfers in the ordinary course of business are not subject to the VNB secured priority.

And finally, NEW LIBERTY and RR argue that, in any case, the pawned items belonged to Ronin Konfos, the debtor's principal, personally, and never constituted property of the debtor in the first place. While it is true that most of the pawn tickets contained the names of both Ronin Konfos and AN FRIEDA, and RR suspected that some of the 131 total transactions he did with Konfos (only 44 remained outstanding) may have belonged to AN FRIEDA, RR testified consistently that he asked Ronin Konfos who the property belonged to and the answer was Ronin Konfos personally. Ronin was a master conman who conned VNB out of millions of dollars, conned RR and NEW LIBERTY, and skipped the country with three and a half million dollars in debtor inventory, leaving the bankruptcy estate with virtually nothing. His wife came from one of the wealthiest landholders in Israel. RR had every reason to believe him when he said the diamonds were his. The evidence was insufficient to conclude that

the diamonds belonged to the debtor. VNB had never taken an inventory and could not say which diamonds belonged to the debtor, and the Trustee testified he also had no way of knowing which diamonds belonged to the debtor.

For the foregoing reasons, the lower court clearly erred in finding that the diamonds were property of the estate, both in findings of fact and in misapplication of § 541(b)(8) of the Code, NY GBL 44(3), and common law. And even if the collateral was property of the estate, the lower court erred in finding RR personally liable for conversion through misapplication of Federal and State common law.

## V.   ARGUMENT

### A.   There is no basis for personal liability against Roni Rubinov.

As detailed *infra*, any finding of conversion against NEW LIBERTY is in violation of F.R.B.P. § 541(b)(8). Moreover, VNB UCC filing did not establish a priority claim over the specific diamonds pawned to NEW LIBERTY because the pawns were made in the ordinary course of business. As well, the evidence did not establish that bankruptcy debtor AN FRIEDA was the rightful owner of the diamonds, as opposed to the individual Ronin Konfino. Any one of the foregoing, if found in NEW LIBERTY's favor by this Court, is grounds for reversal of the liability judgment against Roni Rubinov personally because the only liability held against him is in connection with a conversion finding against NEW LIBERTY.

But, even if this Court upholds liability against NEW LIBERTY, nevertheless, a liability finding against Mr. Rubinov personally is unsupported in New York common

law as recently articulated in 2018 by the Court of Appeals of New York, which was given full recognition by this Court in 2019.

The Court of Appeals, in *Cortlandt St. Recovery Corp. v Bonderman*, 31 NY3d 30, 47-48 [2018], articulated the standard in NY for piercing the corporate veil:

> "Generally, a plaintiff seeking to pierce the corporate veil must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (*Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 18, 29 N.E.3d 215 [2015] [internal quotation marks omitted]; see also *TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 703 N.E.2d 749 [1998] [plaintiff bears "heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences"] ). **At the pleading stage, "a plaintiff must do more than merely allege that [defendant] engaged in improper acts or acted in 'bad faith' while representing the corporation"** (*East Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 16 N.Y.3d 775, 776, 919 N.Y.S.2d 496, 944 N.E.2d 1135 [2011] ). **The plaintiff must adequately allege the existence of a corporate obligation and that defendant "exercised complete domination and control over the corporation and 'abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice'"** (*id.*, quoting *Morris* 82 N.Y.2d at 142, 603 N.Y.S.2d 807, 623 N.E.2d 1157).

The *Cortland* court went on to explain why, in that case, a proper cause of action had been made out in the pleadings to piece the corporate veil:

> [T]the complaint alleges that the private equity defendants owned and controlled Hellas, the parent company of Hellas I and Hellas Finance, and, as the alter egos of the issuer and guarantor, the private equity defendants had control and domination of the corporate form of the companies that defaulted on the PIK notes. **The complaint further alleges that the private equity defendants misused the corporate form** and describes a borrowing scheme that employed the Hellas Group shell companies to acquire long-term debt which dwarfed shareholder

equity, all the while distributing the PIK loan proceeds and certificate redemptions to the private equity defendants. **Critically, the complaint alleges these shell companies were created both to facilitate this flow of funds from the offering of the PIK and subordinated notes, and to conceal the true nature of these transactions from the noteholders** (cf. TNS Holdings, 92 N.Y.2d at 339–340, 680 N.Y.S.2d 891, 703 N.E.2d 749 ["An inference of abuse does not arise ... where a corporation was formed for legal purposes or is engaged in legitimate business."]; see also *Tap Holdings, LLC v. Orix Fin. Corp.*, 109 A.D.3d 167, 175, 970 N.Y.S.2d 178 [1st Dept. 2013] ["The mere fact that (the corporation) continues to operate as a legitimate automotive business should not relieve the Senior Lenders of liability when they are alleged to have caused the creation of the entity specifically to harm the note holders."]). The consequence of these actions, according to the complaint, is that the scheme "forced" the Hellas corporations "to commit business suicide by paying borrowed funds to private equity defendants that the Hellas Defendants could not repay." The complaint describes the precarious financial status of the Hellas Group when the private equity defendants took the corporate assets for themselves, setting forth how and when the business acquired debt, and how that debt continued to grow despite the shareholders disproportionately low equity at the time. The complaint sets forth the alleged fraudulent conveyances, providing the dates and amounts of the PIK note proceeds and certificate redemptions distributed to the private equity defendants and their principals. These factual allegations, along with the reasonable inferences to be drawn therefrom, support a cause of action that Hellas Finance and Hellas I defaulted on payment to the noteholders because the private equity **defendants used their control of the corporate form for the unlawful purpose of intentionally divesting the corporate assets through fraudulent conveyances, under the guise of dividends and redemptions, which in turn rendered these companies insolvent and unable to pay their creditors**.

The case at bar is in stark contrast. Here, in sum and substance, *arguendo* in the worst case scenario, which is not admitted, AN FRIEDA pawned collateral with a prior perfected security interest to NEW LIBERTY, AN FRIEDA was then forced into bankruptcy, and NEW LIBERTY refused to turn over the collateral to the Trustee and is liable in conversion.

The mere fact that NEW LIBERTY operated through a human being, RR, does not in and of itself establish personal liability on his part. *Id.* ("At the pleading stage, 'a plaintiff must do more than merely allege that [defendant] engaged in improper acts or acted in 'bad faith' while representing the corporation.'"). Absent from the Adversary Complaint and the trail transcripts are any allegations or evidence of misuse of the corporate form. The single outstanding cause of action in the Adversary Complaint against RR is the first, for violation of § 549 of the Bankruptcy Code, which alleges nothing more than an improper transfer to satisfy an antecedent debt:

> On information and belief, the transfers of merchandise of the Debtor during the period August 5, 2015 up until September 29, 2015 to Rubinov, New Liberty Pawn Shop and New York Estate Buyers, as transferees, jointly and severally, **allegedly and purportedly for the purposes of the satisfaction of an alleged debt arising before the commencement of the case were post-petition payments violative of § 549(b) of the Bankruptcy Code.**
>
> (Docket #1, ¶ 40) (emphasis added).

There are no allegations of misuse of the corporate form for the purpose of defrauding VNB or any creditors. The Complaint merely alleged that any transfers that took place were for the purpose of satisfaction of an alleged antecedent debt. *Id.* At trial, the Trustee acknowledged that it was not pursuing its conspiracy claim (3rd cause of action). (Docket #160, p. 9). In fact, the words "pierce," "misuse," "abuse," and "fraud" do not appear anywhere in the trial transcripts (Docket #s 154-157).

Notwithstanding a complete dearth of allegations or evidence that RR had stepped out of his corporate role such that personal liability should attached, the lower court *sua sponte* imposed personal liability upon RR. The lower court's basic reasoning was that merely because RR controlled and actively misrepresented what happened to

the collateral, he should be liable for it. (Docket # 160, p. 38). This finding, even if true, which RR does not concede, stands far apart from the level of corporate misuse necessary to impose personal liability on a corporate owner under *Cortland*.

In support of its position, the lower court cited three out of date cases, the most recent of which, from 2015, is nonetheless completely distinguishable from the case at bar, and the other two older cases, based on old NY lower court decisions, are clearly abrogated by *Cortland*:

> *Mayfield v Asta Funding, Inc.*, 95 F. Supp 3d 685, 701 (S.D.N.Y. 2015) (denying motion to dismiss claims against individual defendants where the complaint "[s]ufficiently pleaded the individual Defendants' personal participation in deceptive business practices prohibited by the General Business Law");
>
> *Nat'l Survival Game, Inc. v. Skirmish, U.S.A., Inc.*, 603 F. Supp. 339, 341 (S.D.N.Y. 1985) (noting that "[t]he general principle is that a corporate officer who participates in a tort, even if it is in the course of his duties, may be held individually responsible")
>
> *Key Bank of New York v. Grossi*, 227 A.D.2d 841, 843, 642 N.Y.S.2d 403, 404 (3d Dept. 1996) (corporate officers may be personally liable for commissions of torts "even if the commission or participation is for the corporation's benefit").

The facts in this case are distinguishable from *Mayfield*. The District Court there noted:

> Plaintiffs allege that Defendants Franklin and Wang verified and filed complaints against class members without sufficient review. (Compl. ¶¶ 175–81, 239–44.) For example, Franklin is alleged to have falsely stated, on pain of perjury, that he was "in possession of the salient papers in connection with the action" against Mayfield, when in fact he did not have access to Mayfield's alleged account agreement, terms and conditions, account application, signed contract, original billing statements, payment records or dispute history at the time he verified the complaint. (Id. ¶¶ 175–81.) Wang is alleged to have made identical misrepresentations in the action against Millien. (Id. ¶¶ 239–44.) Plaintiffs also allege that Franklin

signed and submitted an application for default judgment supported by
fraudulent affidavits. (Id. ¶¶ 199–201.) When alleged debtors sought to
vacate improperly obtained default judgments, Plaintiffs allege that
Defendants filed fraudulent oppositions to orders to show cause
supported by false affirmations signed by Defendant Zipkin. (Id. ¶¶ 141,
214–20, 278–84.) Those who succeeded in vacating the judgments against
them were met with further harassing litigation practices, such as legally
improper interrogatories and notices to admit facts reasonably known to
be in dispute at trial, signed by Zipkin or Stiller. (Id. ¶¶ 145–48, 151, 222–
26, 286–90.) *Mayfield v Asta Funding, Inc.*, 95 F. Supp 3d 685, 701 (S.D.N.Y.
2015).

Thus, in *Mayfield,* the allegations of the complaint detailed how the individual

defendants misusing their legal corporation to abuse the legal process, file fraudulent

affidavits, defraud a multitude of debtor defendants and deprive them of their legal

rights. The District Court concluded on those facts that "Plaintiffs have sufficiently

pleaded the individual Defendants' personal participation in deceptive business

practices prohibited by the [NY General Business Law]." *Id.*

Here, however, there are no allegations of deceptive business practices or

violations of the NY General Business Law. At most, the lower court held that the

diamonds in question were not sold to New York Estate Buyers as claimed by RR and

NEW LIBERTY, because the transactions claimed by RR were fictitious and fabricated

by RR for the purpose of concealing what happened to the pawned items. (Docket #

160, p. 38). Assuming, *arguendo*, that this was actually the case, which RR does not

concede, the mechanism by which RR and/or NEW LIBERTY disposed of the

collateral it is immaterial to the tort of conversion. As the lower court's itself made

clear, conversion requires nothing more than "[t]he disposition by a junior creditor of

collateral in which another creditor has a valid and perfected lien." *Id.* at 36. To be liable

in conversion, it does not matter how or why the collateral was disposed of. In fact, it does not even require actual knowledge of a superior right. "See *TMMB Funding Corp.*, supra, 136 A.D.2d 540 (creditor claimed lack of actual knowledge based on alleged defect in the naming of the debtor in a UCC financing statement, but the court held that the statement was sufficient to provide constructive notice and therefore that the senior creditor's claim for conversion had been established)." *Id.* at 37.

Simply put, even in the worst-case scenario (not admitted), the conversion here was complete once return of the diamonds was refused by NEW LIBERTY. There were no allegations, testimony, or facts found demonstrating misuse of the corporate form to achieve the conversion. At most, there was only a finding of an improper or bad faith act, which is insufficient under *Cortlandt,* supra. As well, there was no finding of "the existence of a corporate obligation and that defendant 'exercised complete domination and control over the corporation and 'abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice''." *Id.* See also *In re: Gen. Motors LLC Ignition Switch Litig., RICO Bus Disp Guide* 12747 [SDNY July 15, 2016].

Similarly, *Nat'l Survival Game, Inc. v. Skirmish, U.S.A., Inc.*, 603 F. Supp. 339, 341 (S.D.N.Y. 1985) and *Key Bank of New York v. Grossi*, 227 A.D.2d 841, 843, 642 N.Y.S.2d 403, 404 (3d Dept. 1996) are decades old, out of date cases which do not apply high the standard for personal liability as articulated in 2018 by the Court of Appeals of New York in *Cortland*, supra.

The *Key Bank* decision was from a New York Supreme Court Third Appellate Department decision rendered twenty-two years before *Cortland*. What's more *Nat'l Survival*, the district court's decision there was based on an even older NY Supreme

Court Third Appellate Department decision from 1975 and an even older than that Second Department decision from 1965:

> As to the pendent state claim, New York law also provides that a corporate officer who participates in the commission of a tort, even if he acts on behalf of the corporation and in the course of his corporate duties, may ordinarily be held individually responsible. See, e.g., *Bailey v. Baker's Air Force Gas Corp.*, 50 A.D.2d 129, 376 N.Y.S.2d 212 (**3d Dep't 1975**); *La Lumia v. Schwartz*, 23 A.D.2d 668, 257 N.Y.S.2d 348 (**2d Dep't 1965**). *Natl. Survival Game, Inc. v Skirmish, U.S.A., Inc.*, 603 F Supp 339, 341 [SDNY 1985] (emphasis added).

On the other hand, Eastern District of New York court more recently rendered a decision in 2019, citing *Cortland*, in *United States v Lax*, 414 F Supp 3d 359, 368 [EDNY 2019], supporting the proposition that in New York, the bar to personal liability for corporate acts is indeed a high one:

> As for the second veil-piercing element, **the pleadings are replete with badges of fraud indicating that the Transferee Companies were created and used to hide the Estate's and Trust's assets from its creditors, including the IRS.** All of these companies were held by Shaindy, despite the fact that she has no apparent experience managing multi-million dollar real estate or diamond businesses; additionally, all of them were held under a prior name, "Chana Weisz," making it more difficult to associate them with her late father-in-law's Estate. All of them operated from addresses associated with Moshe's businesses; all were funded by the Trust and/or other financial sources under Moshe's control; most failed to file any tax returns; and all were formed close in time to the Schemes in which they allegedly partook. **At the motion to dismiss stage, these indicia of fraud are enough to support the plausible inference that the Transferee Companies' corporate form was abused to facilitate the Schemes.**

Clearly much more than mere improper or bad faith acts are necessary to pierce the corporate veil and nothing even remotely approaching this magnitude of corporate form abuse has been proven, or even alleged, against Roni Rubinov personally.

For the foregoing reasons, the lower court's finding of liability against Roni Rubinov personally was in error and it is respectfully requested that this Court overturn same.

As well, as demonstrated in ARGUMENT sections B, C, and D, the claims against NEW LIBERTY are clearly erroneous and based upon misapplication of applicable statutory and case law, and there are no claims against Roni Rubinov independent of claims against NEW LIBERTY. Therefore, additionally, upon reversal of the judgment against NEW LIBERTY, Roni Rubinov is likewise entitled to dismissal of the judgment against him.

### B.     Section 541(b)(8) of the Bankruptcy Code Protects NEW LIBERTY's secured interest in the pawned diamonds.

Section 541(b)(8) of the Bankruptcy Code reads as follows:

> (b) Property of the estate does not include-- (8) subject to subchapter III of chapter 5, any interest of the debtor in property where the debtor pledged or sold tangible personal property (other than securities or written or printed evidences of indebtedness or title) as collateral for a loan or advance of money given by a person licensed under law to make such loans or advances, where—
>
>> (A) the tangible personal property is in the possession of the pledgee or transferee;
>>
>> (B) the debtor has no obligation to repay the money, redeem the collateral, or buy back the property at a stipulated price; and
>>
>> (C) neither the debtor nor the trustee have exercised any right to redeem provided under the contract or State law, in a timely manner as provided under State law and section 108(b);

With respect to NEW LIBERTY, as a threshold matter, pursuant to Section 541(b)(8) of the Bankruptcy Code, the pawned items were not property of the estate. The lower court initially recognized this:

> **Section 541(b)(8) of the Bankruptcy Code provides that the term "property of the estate" does not include property that has been pledged for a loan if the debtor is not legally obligated to repay the loan or to redeem the property** and if a timely redemption right has not been exercised as provided in applicable state law and in section 108(b) of the Bankruptcy Code. See 11 U.S.C. § 541(b)(8). This provision was added to the Bankruptcy Code in 2005. It does not explicitly refer to pawnbrokers but it is generally accepted that the provision was enacted with pawn transactions in mind. See 5 *Collier on Bankruptcy* ¶ 541.24 (16th ed.)
>
> **The parties agree that under New York law a person who obtains a loan from a pawnbroker has no legal obligation to repay the loan and no legal obligation to redeem the pawned item.** The pawnbroker's sole recourse, if the item is not redeemed, is to sell the collateral. In that case the pawnbroker has no personal claim against the pledgor; it only has a claim against the pledged property. **The conditions of section 541(b)(8) therefore are satisfied, and section 541(b)(8)[1] is applicable to any pawn transactions that involved property belonging to AN Frieda**.
>
> (Docket # 160, page 11-12) (emphasis added).

*Collier on Bankruptcy* ¶ 541.24 notes:

> Section 541(b)(8) is broadly drafted and does not use the word "pawn." Nonetheless, it may fairly be said that its obvious, fundamental purpose is to declare that certain tangible personal property pledged to pawnbrokers is excluded from property of the estate.

The lower court, here, even went on to note:

> **Here, however, if New Liberty had simply held the diamonds and other property and had never transferred them, then under section**

---

[1] The lower court's Decision after Trial makes reference to § 541(a)(8) in several places by mistake. It is assumed the lower court meant § 541(b)(8). All references herein to the Decision correct this scrivener's error.

> **541(b)(8) of the Bankruptcy Code those items would not even have been considered property of the estate unless the Trustee first paid the redemption prices.** I do not believe it is a sound interpretation of the relevant sections of the Bankruptcy Code to say that the pawned items were subject to a redemption obligation – and would not even have constituted property of the estate unless the Trustee paid what was owed to New Liberty – but that the "transfer" of such property somehow frees the Trustee from that redemption condition, and somehow allows the Trustee to bring the property (or its value) into the estate while at the same time dishonoring the obligations owed to the pawnbroker.
>
> Sections 502(d), 541, 549 and 550 need to be read together and harmonized with each other. If transfers are to be undone and avoided pursuant to sections 549 and 550, then the effect ought to be to restore the parties to the positions they would have occupied if the transfers had not occurred. **Here, that would merely reinstate (not eliminate) the Trustee's redemption obligations and the protections to which New Liberty was entitled under section 541(b)(8).**
>
> **I therefore hold that the Trustee's claims under section 549 and 550 do not permit the Trustee to ignore the amounts owed to New Liberty or the redemption conditions that are imposed by section 541(b)(8) of the Bankruptcy Code.**

(Docket #160, pages 44-45) (emphasis added).

Given the lower court's own well-reasoned analysis of 541(b)(8), it is inexplicable how it jumped to the conclusion that the pawn pledges are nevertheless subject to the senior secured claim of VNB. No dispute existed that the elements of 541(b)(8) are satisfied in this matter and further inquiry should have been foreclosed. As stated in *In re Moore*, 448 BR 93, 101 [Bankr ND Ga 2011], "The conclusion that the pawned vehicles were property of the estate at the time of the filing does not end the inquiry. **All of the rights of the Debtors were subject at the time of the filing of their petition to their timely exercise of their rights to redeem the vehicles** and to the automatic forfeiture of the vehicles to the Pawnbroker and the extinguishment of their

ownership interests. The issue here is what effect the filing of the bankruptcy case had on the Pawnbroker's rights to automatic forfeiture and the automatic extinguishment of the Debtors' ownership rights if redemption did not timely occur." *In re Moore*, 448 BR 93, 101 [Bankr ND Ga 2011] (emphasis added).

Logically, the third prong only makes sense if an item that is pawned has a much greater value than the redemption price. It would make sense that the pawnbroker should not be entitled to a windfall to the detriment of bankruptcy estate creditors in such a situation. Where the Trustee can pay the redemption price and redeem the items of greater value for the estate, he has succeeded in increasing the benefit to the creditors. On the other hand, it makes no sense that the pawnbroker should lose both the cash he gave to the bankruptcy debtor plus the pledge he holds as his security on the fortuitous happenstance for the estate that turnover is demanded, and once denied, it becomes a conversion, and so long as this happens within the redemption period, the property automatically becomes property of the estate and the pawnbroker becomes a junior secured creditor. Every trustee with a pawnbroker stakeholder would scramble to bring this course of events about in the hopes that the timing would result in a windfall for the estate.

The axiom of 541(b)(8) applied here is that pawned collateral, if unredeemed, is **not** property of the estate, but, if redeemed, **is** property of the estate subject to VNB's secured senior claim (and if so redeemed, then NEW LIBERTY is no longer a creditor). Either way, NEW LIBERTY is protected. It either keeps the pledges as unredeemed, or is paid the proper redemption price and turns over the pledges in exchange.

Flying in the face of its own arguments to the contrary, the lower court's conclusion that VNB's interest has priority over NEW LIBERTY's violates 541(b)(8) and should be overturned.

### C.   VNB's UCC filing did not establish a priority claim over specific diamonds pawned to NEW LIBERTY in any case.

Even if section 541(b)(8) is inapplicable, which is not the case, VNB UCC filing did not establish a priority claim over the specific diamonds pawned to NEW LIBERTY. Pursuant to the Pretrial Order, the Plaintiff's and VNB's contentions were that transfers of inventory in the ordinary course of business would be free and clear of the liens:

> The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties. *** [The VNB] security agreement provided, in relevant part, that **the sales or transfers of inventory which were made in the ordinary course of business would be free and clear of the liens of Valley National Bank** but that sales not in the ordinary course of business would not be free of such security interest. (Docket #145, ¶ IV(A)(12)) (emphasis added).

The Bankruptcy Court did not make any finding that the transfer of the diamonds from the debtor to NEW LIBERTY was made in any way other than the ordinary course of business. (Docket #160). The business of NEW LIBERTY Pawn Shop, Inc. was in fact lending money against a pledge. That was NEW LIBERTY's primary, if not only, course of business. It is self-evident that a legitimate, licensed business' only course of business is an ordinary course of business. Appellee-Plaintiff-Trustee made no argument and presented no evidence to the contrary.

Relying on this undisputed exception to the perfected security interest, VNB's interest in the items pawned to NEW LIBERTY were "free and clear of liens of Valley National Bank." Consequently, the lower court erred in concluding that VNB's security interest gave it priority over NEW LIBERTY's security interest, and the lower court's ruling should be reversed.

**D.    The evidence did not establish that AN FRIEDA was the rightful owner of the diamonds. Rather the evidence either was inconclusive or tended to demonstrate that the diamonds were owned by the debtor's principal, Ronen Konfino or his wife, personally, or were on "Memorandum" owned by third party consignors, and not subject to VNB's security interest.**

Even if section 541(b)(8) is inapplicable, which is not the case, and even if VNB's UCC filing established a priority over AN Frieda diamonds pledged as collateral, which is not the case, the evidence did not establish that AN FRIEDA was the rightful owner of the diamonds. Rather the evidence either was inconclusive or tended to demonstrate that the diamonds were owned by the debtor's principal, Ronen Konfino or his wife, personally, or were on "Memorandum" owned by third party consignors, and not subject to VNB's security interest.

RR testified that he consistently questioned the debtor regarding ownership of the diamonds and always received the same answer: they belonged to Ronen Konfino personally, not the debtor, his company.

The Bankruptcy Court made the following observations in its written decision:

> He [Roni Rubinov] did not deny that at least some of the diamonds he received probably belonged to AN Frieda, but he said he did not know which ones and that he believed it was likely that most of the diamonds,

and certain other items he received, were the personal property of Mr. Konfino and of Mr. Konfino's wife.

(Docket #160, p. 13).

And at trial:

… if anything is clear from this testimony, it is that in the witness's mind, uh, when Ronen Konfino said, it's mine, that meant either it belonged to him or his wife personally, or it belonged to AN Frieda. He's -- **he's basically said maybe a hundred times now that to him, that was the same thing.** So when you ask him: who owned it, he's just gonna say again, Ronen Konfino. And the point you're trying to establish, which is, uh, putting aside whether Mr. Konfino had authority to pawn it, did he have an understanding at that time as to whether it belonged to Mr. Konfino individually as opposed to the company. You persist in asking him the question in such a way that you're just continue to get confused answers. So why don't you ask him that way? Any time you asked, who owned it, he has said, Ronen Konfino. And he's also said that to him, that means either Mr. Konfino or the company. So you're not -- asking him the same question isn't establishing anything.

(Docket #156, p. 95, l. 6-24).

## 1.   <u>Non-Memorandum Diamonds</u>

There were diamonds that were identified at trial as "memorandum" diamonds and the remainder of the diamonds were non-memorandum diamonds. Taking the non-memorandum diamonds first, the lower court found as follows:

Given the admitted nature of AN Frieda's business, the nature of the collateral, and the inclusion of AN Frieda's names on the pawn tickets, the weight of the evidence shows that the items pawned in 41 of the 44 defaulted pawn transactions belonged to AN Frieda.

(Docket #160, p. 20).

In coming to this conclusion, however, the lower court seems to disregard much of the relevant evidence, including:

1) The fact that Konfino's individual name was also on the 42 of 44 pawn tickets. (Docket #160, p. 15) ("In 42 of those instances the pawn tickets listed the names of both AN Frieda and Ronen Konfino as the party who pledged the relevant items.").

2) The fact that RR testified that he consistently asked Konfino who the diamonds belonged to and was told they were Konfino's. ("Roni Rubinov also testified generally that whenever he asked about specific items Mr. Konfino confirmed that the relevant items were "his" property."). (Docket #160, p. 17); (Docket #156, p. 95, l. 6-24).

3) Given the fact that Konfino was clearly a conman out to con everyone around him and that he cleverly had collectively defrauded many people and firms out of millions of dollars including VNB, a large bank (Docket # 160, p. 37), the "memorandum" diamond dealers (*Id.* at 21), RR and NEW LIBERTY, and then then fled the country with millions of dollars in diamond inventory (Docket # 154, p. 24, l. 19-24; p. 34, l. 14-25 – p. 35, l. 1-2), it is highly likely that Konfino regularly represented to RR/NEW LIBERTY that the diamonds were his personal property. VNB was conned by Konfino out of $1,835,000 (Docket #160, p. 37) and did not even know it when it was happening over a multi-year period, as the testimony of Joseph Radice, officer of VNB shows:

> Q. Is it possible that a borrower who's leveraged with his present line of credit with the bank in order to pay his debts could go to a pawn broker and borrower just to cover all his bases if you will?
>
> A. It's possible.
>
> Q. Did you suspect that?
>
> A. No.
>
> (Docket # 154, p. 148, l. 7-13).

Even Russel Kranzler, the certified public accountant who testified about the Trustee's and VNB's damage calculations, admitted that it appeared to "make sense" from his analysis that Konfino personally made away with more than three million dollars of inventory noting that of "four and a half million dollars of inventory *** inventory other than the inventory that was left at NEW LIBERTY [$1,242,722.07 (Docket #160, p. 46)] is gone." (Docket #154, p. 34, l. 14-25 – p. 35, l. 1-2).

4) The fact that Konfino was extremely wealthy, whose wife was from one of the "very, very wealthy, large landowners in Israel." (Testimony of Joseph Radice, Docket #154, p. 130, l. 11-13, p. 131, l. 4-7). Given this, it is highly plausible that the diamonds were Konfino's or his wife's personal property.

5) The fact that Konfino and wife skipped the country and defaulted in the bankruptcy proceeding, leaving everyone else to pick up the pieces. (Docket # 154, p. 24, l. 19-24).

6) And, the fact that there was no conclusive testimony or evidence offered to the contrary by anyone including VNB which had failed to even once take a property inventory and offered no other proof of ownership of the diamonds. (Docket #154, p. 146, l. 3-4 (The testimony of Joseph Radice demonstrates that VNB failed to make a physical inspection or count.)). And the testimony of Russel Kranzler confirms that VNB did not know how many diamonds were owned by the debtor. (Docket #154, p. 29, l. 19-21).

Moreover, of the 135 pawn transactions undertaken between NEW LIBERTY and Konfino, (Docket # 145, ¶ 11), Joseph Radice could offer no proof that the Diamonds belonged to AN FRIEDA :

> Q. Yeah. Is there any document, is there any evidence that you could point us to that would confirm that diamonds that went to my client pledged by Konfino/ANF were in fact from the borrower; that is, ANF?
>
> A. I don't have anything.
>
> (Docket #154, p. 158, l. 4-8).

Additionally, the Trustee, when queried by the lower court, also confirmed it had no record of ownership of the Diamonds by AN FRIEDA:

> THE COURT: Have you found any records of the debtor at all that lists specific diamonds that it had owned?
>
> THE WITNESS: No, Your Honor.
>
> (Docket #154, p. 177, l. 9-12).

On this, the Court specifically held that other evidence about ownership was inconclusive:

> Other evidence about ownership was inconclusive. Evidence as to how (and by whom) particular items were acquired might have been convincing in deciding who owned the pawned items, but very little such evidence was offered at trial. (Docket #160, p. 15-16).

It was VNB's burden of proof that the that the diamonds belonged to the debtor, and it wholly failed to meet that burden. See *In re Allou Distributors, Inc.*, 379 BR 5, 30 [Bankr EDNY 2007] ("In an action seeking recovery, the plaintiff has the burden of tracing funds it claims to be property of the estate.").

Regarding proof of ownership, there were two sources of evidence presented. One was 42 of the 44 pawn tickets which contained the joint names of Ronen Konfino

and AN FRIEDA. The second was testimony from RR that it was his belief that the diamonds belonged to Ronen Konfino or his wife personally because he consistently asked that question of Konfino. (Docket #160, p. 17); (Docket #156, p. 95, l. 6-24).

While RR did not deny that it was possible "some of the diamonds he received probably belonged to AN Frieda", (Docket #160, p. 13), he had initiated 135 transactions with Konfino over a fourteen month year period totaling $3,460,690 in loans of which only 44 were in default representing less than one-third of the total loans given. (Docket # 145, ¶¶ 11-13). His admission of "probably" for "some" of the diamond does not rise to the standard of the preponderance of the evidence. The trial court, however, found his testimony not credible merely because it was "self-serving" and "represented an 'educated guess' as to ownership and that the issue of ownership was "relevant to New Liberty and relevant to the pawn transaction." (Docket #160, p. 16-17). But even if the lower court found RR's testimony not credible, as noted, no conflicting testimony was offered from Joseph Radice, the Trustee, or anyone, as discussed above.

The lower court went on to conclude that:

> **Roni Rubinov contends that he did not actually try to figure out at the time whether the property belonged to AN Frieda**, and that in all likelihood much of that property did not belong to AN Frieda, but I find that his testimony on these points was not credible and is against the weight of the evidence, at least as to 41 of the 42 transactions that included the name of AN Frieda on the pawn tickets. As noted above, New Liberty had an obligation under New York State law to make clear, on the pawn tickets, whether Mr. Konfino was acting for himself or as agent for another party. I find after considering the evidence that the real reason why AN Frieda was listed on 42 of the 44 defaulted pawn tickets was that Roni Rubinov understood and believed that Mr. Konfino was acting on behalf of AN Frieda in those transactions. Roni Rubinov's

testimony to the contrary was not credible, with the exception of one transaction (pawn ticket 3434), which as described above involved a loan of $54,050 with the collateral consisting of a rose gold Patek watch with a leather band. Given the admitted nature of AN Frieda's business, the nature of the collateral, and the inclusion of AN Frieda's names on the pawn tickets, the weight of the evidence shows that the items pawned in 41 of the 44 defaulted pawn transactions belonged to AN Frieda.

(Docket # 160, p. 19-20) (emphasis added).

These conclusions are not based on any facts admitted or testimony to the contrary. The findings of fact are arbitrary and clearly erroneous. The lower court's initial statement that "he did not actually try to figure out at the time whether the property belonged to AN Frieda" is belied by the court's own statement that "He's -- he's basically said maybe a hundred times now that to him, that was the same thing. So when you ask him: who owned it, he's just gonna say again, Ronen Konfino." (Docket #156, p. 95, l. 6-24).

But even if, *arguendo*, RR's testimony is discounted, nevertheless, the court's intermediate statement that "I find after considering the evidence that the real reason why AN Frieda was listed on 42 of the 44 defaulted pawn tickets was that RR understood and believed that Mr. Konfino was acting on behalf of AN Frieda in those transactions." is unsupported. The only other evidence produced besides RR's testimony was the pawn tickets listing the names of Ronen Konfino and AN Frieda. This makes ownership by either, without more, fifty/fifty at best, which does not satisfy a preponderance of the evidence standard. Regarding the names, it is an admitted fact that that Ronen and his wife were in the business of diamonds, through AN Frieda. But it is equally an admitted fact that Ronen and his wife were "very, very wealthy, large landowners in Israel." (Docket #154, p. 130, l. 11-13, p. 131, l. 4-7). The choice of

which name to apply to ownership of the pawned items was purely arbitrary and it was clear error to conclude that the evidence established that VNB had met its burden of proof. *In re Allou Distributors, Inc.*, 379 BR 5, 30 [Bankr EDNY 2007].

In furtherance of the arbitrary nature of this finding, the lower court, without any explanation, found that RR's testimony on one of the 42 transactions with AN Frieda's name on the ticket to be credible. RR's testimony to the contrary was not credible, with the exception of one transaction (pawn ticket # 3434), which, as described, above involved a loan of $54,050 with the collateral consisting of a rose gold Patek watch with a leather band. There was evidence submitted that AN Frieda was, besides diamonds, also in the business of watches. The court had this to say in justification of its opinion:

> Pawn ticket 3434 is dated December 15, 2014. It involved a loan of $54,050 against a rose gold Patek watch with a leather band. This pawn ticket listed the names of both Mr. Konfino and of AN Frieda. The main business of AN Frieda was the purchase and sale of diamonds, but the Trustee offered evidence that AN Frieda sometimes sold watches. Frankly, this was the only transaction that I thought presented a close call. Mr. Rubinov testified that Mr. Konfino was wearing the watch when he came to New Liberty's offices and that he had seen Mr. Konfino wearing the watch on prior occasions. I find after considering all of the evidence that the preponderance of the evidence shows that Mr. Konfino owned this particular item, notwithstanding the appearance of the AN Frieda name on the pawn ticket.

Why would the lower court believe RR's testimony that Konfino was wearing the watch when he came that day and on other occasions when the lower court clearly did not lend credibility to virtually anything else RR had to say? The arguments presented by the lower court presume the conclusions and do no more than beg the question.

For the above reasons, VNB failed to meet its burden establishing that the non-memorandum diamonds were owned by AN FRIEDA and the lower court's ruling should be reversed.

## 2.   Memorandum Diamonds

With respect to the memorandum diamonds, the lower court held that the "memorandum" pawned items belonged to the debtor because they were "consigned" items pursuant to NY UCC § 9-102(a)(20), which, according to the lower court's reasoning, made it a "secured credit transaction" and the consignor at best "retains a purchase money security interest" that must be perfected in order to be enforced against other creditors, and if not perfected, which it wasn't here, thus becomes junior to the inventory lien of VNB, subject to VNB's claims and creditor's generally. (Docket # 160, pages 21-23).

The lower court concluded, stating:

> For the foregoing reasons VNB's security interests extended to all property obtained by AN Frieda "on memorandum," and the Trustee has the same rights to recover such property as he has to recover other property of AN Frieda.
>
> (Docket # 160, page 23).

NEW LIBERTY argued that, notwithstanding, it has protection under Section 44(3) of the General Business Law, which states:

> Notwithstanding any general, special or local law or ordinance to the contrary, if a collateral loan broker in good faith and without knowledge extends credit on a loan, the collateral for which was entrusted to the pledgor on consignment or was entrusted by a merchant dealing in goods of the kind pledged to the pledgor who was a merchant dealing in goods of the kind pledged, the collateral loan broker shall be required to

relinquish the collateral to the legal owner provided the amount of the loan and interest due is paid.

(Docket # 160, pages 23-24).

First, the lower court argued that this statute is inapplicable because it only applies to claims by "another merchant." (Docket # 160, p. 24). But that is not how the statue reads. With respect to the term "merchant" the statute does not require a claim by a "merchant." Rather it is specifying claims made with respect to pledges received by a pledgor on consignment or which was received by a pledgor who is a merchant dealing in goods of the kind pledged entrusted with goods by a merchant dealing in goods of the kind pledged. The lower court recognized that that the pledge was made according to the dictates of the statute:

> In this case, the evidence showed that AN Frieda was a "merchant" who dealt in diamonds and other jewelry; that it dealt in goods in its own name and not in the names of its consignors or other persons; that it was not an auctioneer; and that it was generally known to be trading its own merchandise for its own account and benefit, and not on behalf of others. The items involved in each "memorandum" transaction exceeded $1,000 in value. The goods transferred by "memorandum" were not "consumer goods" because they were acquired for purposes of sale;
>
> (Docket # 160, p. 22).

The goods thus transferred fall within the definition of GBL 44(3).

The lower court also argued that even if GBL 44(3) applied, NEW LIBERTY was not protected because it had constructive knowledge of VNB prior security interest, violating the "without knowledge" prong. (Docket # 160, page 24). ("In addition, New Liberty at all times had **constructive knowledge** of VNB's security interests, because those interests were set forth in a valid UCC financing statement.")

(emphasis added). In a case on point, the United States Court of Appeals, Fourth Circuit stated succinctly:

> As several courts have noted when analyzing § 544 of the bankruptcy code, "[t]he term 'notice' may include either actual or constructive notice, while **the term 'knowledge' includes only actual notice**. That Congress selected the term 'knowledge' is significant." In *re Richardson*, 23 B.R. 434, 439 (Bankr.D.Utah 1982); accord *In re Euro-Swiss International Corp.*, 33 B.R. 872, 881 (Bankr.S.D.N.Y.1983); *In re Kelly*, 29 B.R. 708, 710 (Bankr.D.Me.1983); see also *McCannon v. Marston*, 679 F.2d 13, 16–17 (3d Cir.1982) (**error to equate knowledge with notice**). We believe that this reasoning applies with equal force to § 550(b)(1) of the Code. Therefore, Orie is entitled to the protection of § 550(b)(1) notwithstanding his constructive notice of the deed of trust.

*Smith v Mixon*, 788 F2d 229, 232 [4th Cir 1986] (emphasis added).

Likewise, the reasoning and public policy behind "the term 'knowledge' includes only actual notice" apply with equal force to § 44(3). NEW LIBERTY is entitled to the protection of N.Y. Gen. Bus. Law § 44(3) notwithstanding its constructive notice of the prior security lien.

Finally, the lower court argued that VNB does not claim that it is an owner pursuant § 44(3), but that it is a secured creditor. (Docket # 160, p. 22) ("VNB is a secured creditor; it does not claim to be an "owner" of the collateral and it does not assert a claim of the kind that is addressed in section 44(3)"). (Docket # 160, page 24). This argument puts form before substance and is belied by the options available to a secured creditor pursuant to UCC Article 9.

Under Article 9, Part 6, a secured creditor has several options upon default, many of which are tantamount to obtaining ownership in the collateral or the equivalent thereof. One of the options is, in fact, taking ownership. See UCC 9-620 "Acceptance

of Collateral in Full or Partial Satisfaction of Obligation." The other options include Foreclosure, UCC 9-610, Judicial Enforcement, UCC 9-601, and Collection Right, UCC 9-607, all of which equate, in the end, to the secured party owning something – either the collateral or its money's worth.

Any claim to the contrary works to render harm to the purpose of § 44(3). The statute, on its face, is intended to protect against a pawnbroker's loss of the collateral to even the "legal" owner without receiving repayment of the loan and principal. Even more so, public policy dictates that someone who seeks to exercise rights equivalent to the "legal" owner – tantamount to a constructive legal owner - should have no more rights than those of the legal owner. To provide a buffer against such potential scenarios, and to protect the pawnbroker, the legislature specifically foreclosed the application of other laws, to wit: "Notwithstanding any general, special or local law or ordinance to the contrary…" N.Y. Gen. Bus. Law § 44(3).

For the foregoing reasons, the memorandum diamonds are protected from acquisition in collateral or its money's worth by VNB pursuant to N.Y. Gen. Bus. Law § 44(3). Consequently, the Bankruptcy Court clearly erred in its application of NY UCC Article 9, and its decision should be reversed.

## VI.   <u>CONCLUSION</u>

For the reasons stated herein, the lower court clearly erred in various findings of fact and misapplied applicable statutory and case law. It is respectfully requested that the District Court overturn the lower court's decision holding NEW LIBERTY and Roni Rubinov jointly and severally liable and dismiss the action against NEW LIBERTY and Roni Rubinov in its entirety.

Official Form 417C (12/18)

*[This certification must be appended to your document if its length is calculated by maximum number of words or lines of text rather than number of pages.]*

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

8015(a)(7)(B)

1.  This document complies with [the type-volume limit of Fed. R. Bankr. P. [*insert Rule citation; e.g.,8015(a)(7)(B)*]] [the word limit of Fed. R. Bankr. P. [*insert Rule citation; e.g., 8013(f)(3)(A)*]] because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g) [and [*insert applicable Rule citation, if any*]]:

9,904

☒ this document contains [*state the number of*] words, **or**

☐ this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2.  This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because:

☐ this document has been prepared in a proportionally spaced typeface using [*state name and version of word-processing program*] in [*state font size and name of type style*], **or**

☐ this brief has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

_____     Date: September 13, 2020  _____
Signature

Print name of person signing certificate of compliance:

Akiva Shapiro _____